Case No. 23-11327-H

# United States Court Of Appeals
# For The Eleventh Circuit

UHS OF DELAWARE, INC. AND PREMIER HEALTH
SOLUTIONS OF FLORIDA dba SUNCOAST BEHAVIORAL
HEALTH CENTER,

*Petitioners,*

v.

OCCUPATIONAL HEALTH AND SAFETY REVIEW
COMMISSION and SECRETARY OF LABOR,

*Respondents.*

_____

**BRIEF OF PETITIONER PREMIER BEHAVIORAL HEALTH
SOLUTIONS OF FLORIDA, INC. d/b/a SUNCOAST
BEHAVIORAL HEALTH CENTER**

**JACKSON LEWIS P.C.**
Dion Y. Kohler
Melanie L. Paul
171 17th Street, N.W., Suite 1200
Telephone: 404.525.8200
Facsimile:  404.525.1173
Dion.Kohler@jacksonlewis.com

*Attorneys for Petitioner Premier
Behavioral Health Solutions of
Florida, Inc. d/b/a Suncoast
Behavioral Health Center*

## I.    CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 - 26.1-3, Plaintiff-Appellant, Premiere Health Solutions of Florida dba Suncoast Behavioral Health Center, certifies that the following persons or entities may have an interest in the outcome of this litigation:

1.    David L. Luck, Appellant Attorney for UHS of Delaware, Inc.

2.    Kip Adams, Appellant Attorney for UHS of Delaware, Inc.

3.    Timothy Brown, Appellant Attorney for UHS of Delaware, Inc.

4.    Anne R. Godoy, Appellee Counsel for Secretary of Labor

5.    Rachel Gaeber, Regional Counsel for Occupational Safety and Health

6.    Edmund C. Baird, Associate Solicitor of Labor for Occupational Safety and Health

7.    Seema Nanda, Solicitor, U.S. Department of Labor

8.    Tremelle I. Howard, Regional Solicitor, U.S. Department of Labor

9.  Stanley E. Keen, Former Regional Solicitor, U.S. Department of Labor

10. Lydia J. Chastain, Trial Counsel for Secretary of Labor

11. Heather R. Phillips, Appellee Counsel for Secretary of Labor

12. Josh G. Gilliand, Appellee Counsel for Secretary of Labor

13. Amy S. Tryon, Appellee Counsel for Secretary of Labor

14. The Honorable Dennis L. Phillips, Administrative Law Judge, Occupational Safety & Health Review Commission

15. Mr. John X. Cerveny, Executive Secretary, Occupational Safety and Health Review Commission

16. Dion Y. Kohler, Appellant Attorney for Premier Health Solutions of Florida dba Suncoast Behavioral Health Center

17. Melanie L. Paul, Appellant Attorney for Premier Health Solutions of Florida dba Suncoast Behavioral Health Center

18. David L. Luck, Appellant Attorney for Appellant UHS of Delaware, Inc.

19. Kip J. Adams, Appellant Attorney for Appellant UHS of Delaware, Inc.

3

20. Raymond Perez, II, Appellant Attorney for Premier Health Solutions of Florida dba Suncoast Behavioral Health Center

21. UHS of Delaware, Inc.

22. The Honorable Cynthia Attwood, Chairman of Occupational Safety and Health Review Commission

23. The Honorable Amanda Wood Laihow, Former Commissioner of Occupational Safety and Health Review Commission

## CORPORATE-DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, and Eleventh Circuit Local Rules 26.1-1 – 26.1-3, Plaintiff-Appellant, is a wholly-owned subsidiary of Universal Health Services, Inc., which is a publicly traded corporation. No publicly held corporation that owns 10% or more of its stock.

## II.    STATEMENT ON ORAL ARGUMENT

Suncoast requests oral argument and believes it would be of aid to the Court in rendering a decision.

## III.    TABLE OF CONTENTS

**I. CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT** ......................... 2

**II. STATEMENT ON ORAL ARGUMENT**. ................................ 4

**III. TABLE OF CONTENTS** ........................................................ 4

**IV. TABLE OF CITATIONS** ...........................................................

**V. STATEMENT OF ADOPTION OF BRIEFS AND OTHER PARTIES** ...................................................................... 6

**VI. STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTIONAL** .................................................. 7

**VII. STATEMENT OF RELATED CASES** ................................... 8

**VIII. STATEMENT OF THE ISSUES** ........................................ 8

**IX. STATEMENT OF THE CASE** .................................................. 9
   A.  Course of Proceedings and Disposition in the Agency Below ................................................................................. 9
   B.  Statement of the Facts ........................................................... 10
   C.  Statement of the Standard or Scope of Review .................... 13

**X. SUMMARY OF THE ARGUMENT** ....................................... 14

**XI. ARGUMENT AND CITATIONS OF AUTHORITY** ........... 16
   A.  The Commission Erred by Not Requiring the Secretary to Prove that Each Proposed Abatement Measure was Effective and Feasible ................................................................................. 16
   B.  The Commission Erred by Not Finding the Secretary Failed to Prove that The Third and Fourth Proposed Abatement Measures Were Effective and Feasible ................................... 23
   C.  The Use of the General Duty Clause and Reliance on OSHA Guidance Documents to Impose Regulatory-Type

       Requirements to Address Workplace Violence violates the
       Administrative Procedure Act ................................................ 29

  D. The General Duty Clause as Applied Deprived Suncoast of
      Fair Notice of the Third and Fourth Proposed
      Abatement Measures ............................................................ 33

  E. The Commission Erred by Not Concluding that Suncoast
      Could Rely on Guidance by the FDMH and Other
      Regulatory Bodies ................................................................ 43

**XII. CONCLUSION** ....................................................................... 47

# IV.    TABLE OF CITATIONS

## Cases

A. H. Sturgill Roofing, Co., 27 BNA OSHC 1809 (2019)................. 35

Am. Iron & Steel Inst. v. OSHA, 939 F.2d 975, 980 (D.C. Cir. 1991) .... 18

BHC Nw. Psychiatric Hosp. LLC, 951 F.3d 558, 566 (D.C. Cir. 2020)
................................................................................................... 33

C&W Facility Servs. v. Sec'y of Labor, 22 F. 4th 1284, 1287 (11th
  Cir. 2022) ............................................................................... 11, 13

Donovan v. Royal Logging Co., 645 F.2d 822, 831 (9th Cir. 1981) . 34

FCC v. Fox Television Stations, Inc., 567 U.S. 239, 253, 132 S.Ct.
  2307, 183 L.Ed.2d 234 (2012)) ...................................................... 33

FCC v. Fox TV Stations, Inc., 567 U.S. 239 (2012) ......................... 33

Fluor Daniel v. Occupational Safety and Health Rev. Comm'n, 295
  F.3d 1232, 1236 (11th Cir. 2002).................................................. 13

Ga. Dep't of Educ. v. U.S. Dep't of Educ, 883 F.3d 1311, 1314 (11th
  Cir. 2018) ...................................................................................... 12

Grayned v. City of Rockford, 408 U.S. 104, 107 (1972) .................. 33

INS v. Yueh-Shaio Yang, 519 U.S. 26, 32 (1996))........................... 12

J.A.M. Builders, Inc. v. Herman, 233 F.3d 1350, 1352 (11th Cir.
  2000)............................................................................................... 13

Johnson v. Ashcroft, 286 F.3d 696, 700 (3d Cir. 2002).................... 20

Michigan v. EPA et al., 135 S. Ct. 2699, 2707 (2015)...................... 29

Nat'l Min. Ass'n v. Sec'y of Labor, 812 F.3d 843, 865 (11th Cir. 2016)....................................................................................... 12
Nat'l Mining Ass'n v. USW, 985 F.3d 1309, 1321 (11th Cir. 2021). 12
Nat'l Realty & Constr. Co. v. OSHRC, 489 F.2d 1257 (D.C. Cir. 1973)) ..................................................................................... 34
Nat'l Realty & Constr. Co., Inc. v. OSHRC, 489 F.2d 1257 n.37 (D.C. Cir. 1973)............................................................................ 29
Patel v. U.S. A.G., 971 F.3d 1258, 1268 (11th Cir. 2020)................. 12
Pepperidge Farm, Inc., 17 BNA OSHC 1993, 2032, 1995-97 CCH OSHD ¶ 31,301, p. 44,014 (No. 89-0265, 1997)............................ 34
Sec'y of Labor v. UHS of Denver, Inc. dba Highlands Behavioral Health Sys., OSHRC Docket No. 19-0550 (ALJ Patrick, May 19, 2023)........................................................................................ 16
USF Fed. Credit Union v. Gateway Radiology Consultants, P.A. (In re Gateway Radiology Consultants, P.A.), 983 F.3d 1239, 1262 (11th Cir. 2020) ..................................................................................... 12

**Statutes**
29 U.S.C. § 655(b)............................................................................. 18
29 U.S.C. § 660(a) ........................................................................ 6, 13
5 U.S.C. § 500 *et. seq.* ("APA") ........................................................ 14
5 U.S.C. § 553(c) .............................................................................. 27
Small Business Regulatory Enforcement Fairness Act of 1996, 5 U.S.C. § 1 *et. seq.* ("SBREFA") .................................................... 30

## V.     STATEMENT OF ADOPTION OF BRIEFS OF OTHER PARTIES

Suncoast adopts Petitioner UHS-DE's brief and arguments on the Commission's finding that Suncoast and Appellant UHS-DE operated as a single employer and are jointly liable for the alleged violation of the Act.

7

## VI.   STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTIONAL

The Occupational Safety and Health Review Commission ("OSHRC") issued a final decision affirming OSHA's citation and penalty against Suncoast and UHS-DE on February 28, 2023. Suncoast timely petitioned for judicial review in this Court on April 26, 2023. *See* 29 U.S.C. § 660(a) (allowing 60 days to petition for judicial review). Because Suncoast's principal office is in the Eleventh Circuit, this Court has jurisdiction. *See id.* § 660(a) (allowing judicial review in the circuit "where the employer has its principal office").

## VII.   STATEMENT OF RELATED CASES

Suncoast is unaware of any related cases. This case has not come before this Court previously.

## VIII.   STATEMENT OF THE ISSUES

1.      Whether the OSHRC abused its discretion by requiring that the Acting Secretary of Labor ("Secretary") prove that only one of the proposed abatement measures was not implemented and was both effective and feasible.

2.      Whether the OSHRC abused its discretion by finding that the Secretary proved that the third and fourth abatement measures would be effective in materially reducing the hazard and were economically feasible.

3.      Whether use of the General Duty Clause and reliance on OSHA Guidance documents to impose regulatory-type requirements to address workplace violence violates the Administrative Procedure Act.

4.      Whether the Commission's use of the General Duty Clause as applied in this case deprived Petitioner Suncoast of fair notice that the third and fourth proposed abatement measures were required.

5.       Whether the OSHRC abused its discretion by not finding that Petitioner Suncoast could rely on guidance by the Florida Department of Mental Health ("FDMH"), the Center for Medicare and Medicaid Services ("CMS") and other regulatory and accrediting bodies.

## IX.    STATEMENT OF THE CASE

### A. Course of Proceedings and Dispositions in the Agency Below

On April 24, 2018, OSHA issued a citation to Suncoast and UHS-DE alleging a repeat violation of Section 5(a)(1) of the Occupational Safety and Health Administration of 1970 ("OSH Act") for exposing employees to the hazard of workplace violence, specifically defined as patient to staff aggression. Suncoast timely filed a notice of contest. After a multi-day hearing and post-hearing briefing, ALJ Dennis L. Phillips issued a decision affirming the citation, but classifying it as serious against both Respondents, which was docketed on April 20, 2021. Petitioners petitioned for discretionary review with the Occupational Safety and Health Review Commission ("Commission") which was granted on May 19, 2021. On May 21, 2021, the Commission issued a briefing notice directing review on two issues. The parties submitted briefs and on February 28, 2023, the Commission issued its decision affirming the Citation against Petitioners.

## B. Statement of the Facts

Suncoast is an in-patient psychiatric hospital; the core of its business is treating seriously mentally ill patients who may be a harm to themselves or others. Tr. 2326. Most patients are involuntarily committed for treatment. Tr. 2324. Suncoast has 3 patient units with a total of 60 beds. ALJ Dec., slip op. at p. 9.

Suncoast implemented various means directed at mitigating the hazard of patient aggression towards staff including: locking access to all the units; using security cameras; restricting patients who show signs of aggression to their unit; obtaining a detailed history on new patients including a history of violence; adding more staff when the patient acuity level is high on a unit; reporting any acts of patient aggression during a shift; training all staff on preventing workplace violence when hired and annually; extensively training all patient care staff on verbal de-escalation and physical restraint of aggressive patients when hired and annually; training staff on responding to workplace violence incidents when hired and annually; training staff on milieu management when hired and annually; training staff on trauma informed care when

hired and annually; searching all new patients for contraband including potential weapons; identifying new patients who are a high-risk for aggression and taking precautionary measures; preparing a personal safety plan for each new patient; conducting shift hand-off communications which identifies any problems with each patient; conducting checks on every patient at least every 15 minutes; placing a patient who displays aggression under one-on-one observation; conducting new hire and annual training on code procedures to use when staff need assistance with an aggressive patient; making walkie talkies available to staff to summon assistance; conducting post-incident debriefings with involved staff members; analyzing incident trends to identify corrective measures; maintaining various committees and daily "flash" meetings of hospital leadership to review incidents of patent aggression; conducting daily treatment team meetings during which each patient's behavior is discussed; and establishing a liaison relationship with local law enforcement to assist when needed. Tr. 2297-2299, 2301, 2380, 2135-2136, 2309-2310, 2351-2352, 2392-2394, 2384, 2390, 2774-2775, 2104-2105, 2396, 2985-2986, 2395,

2375, 2735, 2745, 2381, 2360, 3557-3558, 2402-2403, 2754, 2551-2552, 2613, 2620-2621, 2530-2531, 2672-2676, 2353-2355, 2648-2652, 2688-2689, 2329, 2332. The Secretary acknowledges the hazard cannot be eliminated.

## C. Statement of the Standard or Scope of Review

This Court "will set aside an order of the commission only if it is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the law." *C&W Facility Servs. v. Sec'y of Labor*, 22 F. 4th 1284, 1287 (11th Cir. 2022) (citing 5 U.S.C. § 706(2)(a) and *Fluor Daniel v. Occupational Safety and Health Rev. Comm'n,* 295 F.3d 1232, 1236 (11th Cir. 2002)). An agency action is arbitrary and capricious if the agency: 1) relied on factors which Congress has not intended it to consider; 2) entirely failed to consider an important aspect of the problem; 3) offered an explanation for its decision that runs counter to the evidence before the agency: or 4) is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *USF Fed. Credit Union v. Gateway Radiology Consultants,*

*P.A. (In re Gateway Radiology Consultants, P.A.)*, 983 F.3d 1239, 1262 (11th Cir. 2020) (quoting *Ga. Dep't of Educ. v. U.S. Dep't of Educ*, 883 F.3d 1311, 1314 (11th Cir. 2018)).

An irrational departure from an agency's precedent constitutes action that must be overturned. *Patel v. U.S. A.G.*, 971 F.3d 1258, 1268 (11th Cir. 2020) (citing *INS v. Yueh-Shaio Yang*, 519 U.S. 26, 32, 117 S. Ct. at 353) (1996)). Such departure from precedent by an agency must be logical and requires a rational explanation to be upheld. *Nat'l Mining Ass'n v. USW*, 985 F.3d 1309, 1321 (11th Cir. 2021) (quoting *Nat'l Min. Ass'n v. Sec'y of Labor*, 812 F.3d 843, 865 (11th Cir. 2016) (internal quotation omitted) (citation omitted)).

Decisions by the Commission on questions of fact are reviewed for "substantial evidence." 29 U.S.C. § 660(a); *Fluor Daniel v. Occupational Safety and Health Rev. Comm'n,* 295 F.3d 1232, 1236 (11th Cir. 2002). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *C&W Facility Servs. v. Sec'y of Labor*, 22 F. 4th 1284, 1287 (11th Cir. 2022) (citing *J.A.M. Builders, Inc. v. Herman*,

233 F.3d 1350, 1352 (11th Cir. 2000) (internal quotation marks omitted)).

## X.    SUMMARY OF THE ARGUMENT

The Commission erred in finding that the Secretary proved that the third and fourth abatement measures proposed by the Secretary, which would require that an unspecified number of additional hospital staff be hired for security purposes would be effective in materially reducing the hazard and were economically feasible.[1] In addition, the Commission abused its discretion and was arbitrary and capricious by requiring the Secretary prove that only one of the proposed abatement measures was not implemented and was both effective and feasible.

Certain proposed abatement measures are regulated by the Florida Department Mental Health ("FDMH"), the Center for Medicare and Medicaid Services ("CMS"), and accrediting bodies like The Joint

---

[1] The Secretary's other proposed abatements were implementation of a comprehensive workplace violence prevention program, reconfiguration of the nurses' workstations, revising intake procedures, creating a law enforcement liaison position, certain staff training and investigation and debriefing of each incident of workplace violence.

Commission ("TJC") with special expertise in striking the proper balance between maintaining a safe environment for patients and staff and minimizing the impact on effective clinical care. The Commission erred by not deferring to or even considering the position of such regulatory and accrediting bodies on the proposed abatements. In addition, OSHA's failure to enact a workplace violence regulation and instead impose abatements under the catch-all General Duty Clause runs afoul the Administrative Procedure Act, 5 U.S.C. § 500 *et. seq.* ("APA") and deprived Suncoast of fair notice. The Commission's inconsistent application of the proposed abatements also deprived Suncoast of fair notice.

Accordingly, this Court should set aside the order of the Commission and vacate the citation.

## XI.   ARGUMENT AND CITATIONS OF AUTHORITY

### A. The Commission Erred by Not Requiring the Secretary to Prove that Each Proposed Abatement Measure Was Effective and Feasible.

In *UHS of Westwood Pembroke, Inc., UHS of Delaware, Inc.,* No. 17-0737, 2022 WL 774272 at *8 (OSHRC, Mar. 3, 2022) *aff'd,* No. 22-

1845, 2023 WL 3243988 (3d Cir. May 4, 2023) (unpublished), the Commission ruled that when multiple forms of abatement are alleged as part of a process, proof of the feasibility of any individual abatement proposal is sufficient to affirm a violation of the General Duty Clause.[2] This was a vast departure from prior Commission precedent which required the Secretary to prove feasibility, including economic feasibility, for each proposed abatement. *See Sec'y of Labor v. UHS of Denver, Inc. dba Highlands Behavioral Health Sys.*, OSHRC Docket No. 19-0550 (ALJ Patrick, May 19, 2023)(slip op. at p. 12)[3].

---

[2] The Commission in *Pembroke* cited *A.H. Sturgill Roofing, Inc*., 2019 WL 1099857, at *9 (OSHRC Feb. 28, 2019), which is not a workplace violence case. In *Sturgill*, the hazard was exposure to heat hazards from hot weather and the proposed abatement under the General Duty Clause was to implement a heat exposure program. In contrast, in a workplace violence case, OSHA requires the employer to use OSHA's Guidelines for Preventing Workplace Violence for Healthcare and Social Assistance Service Workers ("Guidelines") which require a process-based approach to mitigation. The Commission recognized this distinction in *Pembroke*: "[t]he Secretary's approach . . .aligns with the nature of workplace violence, which as alleged here arises in different contexts and conditions at Pembroke, necessitating different abatement measures." 2022 WL 774272, at *8.

[3] Available at **https://www.oshrc.gov/assets/1/18/AMENDED_Final_ALJ_Decisi on_and_Order_19-**

In any case involving workplace violence, the Secretary alleges a process-based approach because such an approach is required by the OSHA Guidelines as part of an effective WVPP.[4] As a result of this misguided approach, the Secretary is improperly relieved of her burden to show each proposed abatement, which have distinct and different economic costs to an employer, are economically feasibility and effective. In this case, Commissioner Laihow in her concurring opinion, well explained this defect in the *Pembroke* decision. As stated by Commissioner Laihow:

> [I]n my view, it is important for the Commission to ensure that proposed abatement measures, such as the ones in this case, are properly vetted—i.e., that the Commission assesses their feasibility and effectiveness.[5]

---

**550_UHS_of_Denver_Inc._dba_Highlands_Behavioral_Health_System_-_for_website.pdf?12407**.

[4] No Commission decision addressing workplace violence since *Pembroke* has found that the Secretary was not proposing a process-based approach towards abatement.

[5] Op. 16, citing *UHS of Denver,* 2022 WL 17730964, at *6; *RoadSafe Traffic Sys., Inc.,* No. 18-0758, 2021 WL 5994023, at **8-9 (OSHRC Dec. 10, 2021); *Waldon Health Care Ctr.,* 16 BNA OSHC 1052, 1064 (No. 89-2804, 1993) (consolidated)).

A subsequent decision by ALJ Joshua R. Patrick involving a different behavioral health hospital, agreed with Commissioner Laihow and adopted her analysis:

> [T]he Court finds Commissioner Laihow's concurrence provides insightful guidance as to how abatement proposals, characterized as a process, should be addressed. Indeed, if the Commission does not properly 'vet' a handful of abatement proposals as part of a larger process, the employer could be left wondering which of the abatement proposals is affirmed as a final order of the Commission. This is particularly important because, under Section 10(b) and 17(d) of the Act, an employer can be cited for failure to abate the hazard, which can subject them to $15,625 per day in penalties.
>
> Commissioner Laihow's concurrence also highlights an additional, albeit unstated concern: without a finding that a particular form of abatement is feasible, the Commission has ostensibly relieved the Secretary of its burden of proof as to that form of abatement. As in many of the UHS cases, it is easier to uphold an entire violation based on a paperwork abatement method versus a requirement to hire additional staff or make physical changes to the workplace, both of which require capital outlays.

*Highlands,* slip op. at p. 3. ALJ Patrick found that the Secretary failed to establish the economic feasibility of two forms of abatement: additional staffing and having a dedicated security staff.

Commissioner Laihow provided well-reasoned and detailed support for her position that the Secretary should have to prove the

effectiveness and feasibility (including economically feasibility) of each proposed abatement in a process-based abatement case.

> As with abatement measures proposed in other general duty clause citations, these proposed measures are akin to the requirements of a promulgated standard, but are not subject to the same rigorous notice and comment rulemaking process. 29 U.S.C. § 655(b) (stating how Secretary may promulgate, modify, or revoke an 'occupational safety or health standard'); *see Am. Iron & Steel Inst. v. OSHA,* 939 F.2d 975, 980 (D.C. Cir. 1991) ('To prove economic feasibility [of a promulgated standard], OSHA must construct a reasonable estimate of compliance costs ....') (citation omitted).

> Indeed, employers are often forced to rely on the Commission's review of a general duty clause citation's proposed abatement measures to determine their compliance obligations. *See Integra Health Management, Inc.,* No. 13-1124, 2019 WL 1142920, at *15 (OSHRC Mar. 4, 2019) (Sullivan, J., concurring) (noting that 'a check on the application of the general duty clause is necessary,' particularly when 'a broad hazard such as workplace violence' is at issue, because fair notice is 'inherently problematic' under the broad language of the clause and the Secretary, therefore, often relies on OSHA guidance to the regulated community—not subject to notice-and-comment rulemaking—to establish general duty clause requirements).

Op. 16. Commissioner Laihow determined in this case that the Secretary failed to prove that the third and fourth abatement measures (requiring Suncoast to hire additional staff on each shift without patient care

20

responsibilities and providing security type personnel on all shifts) were economically feasible.[6] *Id*.

Commissioner Laihow highlighted requiring the Secretary to prove that each of the proposed abatement measures were economically feasible.

> One last point bears noting. This case is just another in a series of recent matters where the Commission has been faced with the issue of economic feasibility for an alleged general duty clause violation. In *UHS of Denver,* for example, the Commission remanded for the judge to determine whether the Secretary had in fact established economic feasibility notably, the Secretary faulted the employer for having 'provided no evidence that it could not afford to implement [the proposed abatement] measures' even though our precedent makes clear that this burden rests with the Secretary. 2022 WL 17730964 at **2-3. And in a recent decision in another case, *United States Postal Service,* the Commission found that the Secretary provided no cost estimates for any of his proposed abatement measures, let alone proof that their implementation would not threaten the Postal Service's economic viability. Docket No. 16- 1 713, slip op. at 20-24 (OSHRC Feb. 17, 2023) (consolidated). The case currently before us is yet another

---

[6] Commissioner Laihow agreed that the Commission was not compelled to address the economic feasibility of the third and fourth abatement measures, but this appears inconsistent with her opinion that the economic feasibility of each proposed abatement must be proven by the Secretary. *Id*. at 15.

> reminder for the Secretary that economic feasibility is a
> critical part of his prima facie case.

Op. 18.

For the reasons discussed, the Commission's approach in *Pembroke* is arbitrary, capricious and an abuse of discretion. It departs from well-established Commission precedent without adequate explanation. *Johnson v. Ashcroft,* 286 F.3d 696, 700 (3d Cir. 2002). This departure is not only contrary to Commission law which requires that the Secretary prove that each proposed abatement measure is economically feasible, but improperly applies the General Duty Clause by bypassing the regulatory processes which ensures proposed abatements are economically feasible. It also deprives employers of fair notice of what action is required to comply. Without Court intervention, the Commission will continue to improperly relieve the Secretary of her burden to prove the economic feasibility of each proposed abatement measure in general duty cases involving workplace violence. This Court should find that *Pembroke* was incorrectly decided and thus the Commission's reliance on that precedent in this case is improper and likewise arbitrary and capricious and the decision should be overturned.

**B. The Commission Erred by Not Finding the Secretary Failed to Prove that the Third and Fourth Proposed Abatement Measures Were Effective and Feasible.**

Although the Commission requested briefing on the economic feasibility of the third and fourth abatements, the Commission determined it was unnecessary for the Secretary to prove the economic feasibility of these abatements based on *Pembroke*. As discussed, this was erroneous. The Commission should have addressed this issue and found, as did Commissioner Laihow, that the Secretary did not prove the economic feasibility of these two abatements. As explained by Commissioner Laihow, these abatements would require Suncoast to hire staff to fill six 8-hour shifts for every 24-hour period who could not be given patient care responsibilities.[7] Op. 16. The Secretary put forth no evidence on the cost to Suncoast of implementing these measures or the ability of the employer to afford what the Secretary

---

[7] The average daily patient census at the Suncoast facility was 35 in 2017 and 37 in 2018. Tr. 2304. The facility would normally staff one nurse and one MHT on each unit for every 12 patients. Tr. 2307. Therefore, the proposed abatement would result in an 86-100% increase in staffing on the units each day.

says is required.[8] *See Waldon Healthcare Grp.,* No. 89-2804, 1993 WL

119662 at *15.

 Commissioner Laihow analyzed and rejected each of the

Secretary's arguments that she proved the economic feasibility of these

two abatement measures.

> The Secretary puts forth several arguments purporting to
> show that he established the abatement measures'
> economic feasibility, but these post hoc rationalizations fall
> completely short. For example, the Secretary parrots the
> judge's finding that Respondents' 'partial implementation'
> of the proposed staffing measures--- a 'float' and an intake
> mental health technician were added to certain shifts—

---

[8] Generally, the Commission and circuit courts rely on expert financial
and economic testimony. *See United States Postal Svc.,* 2023 WL
2263313; *Beverly Enters., Inc. d/b/a Richland Manor,* No. 91-3144,
2000 WL 34012177 (OSHRC, Oct. 27, 2000) (consolidated); *Smith
Steel Casting Co. v. Brock*, 800 F.2d 1329 (5th Cir. 1986). There are
limited exceptions which are inapplicable here. *See Sea World of Fla.
v. Perez,* 748 F.3d 1202, 1215 (D.C. Cir. 2014) (feasibility shown
because the employer had already "implemented many of these measures
on its own"); *Puffer's Hardware, Inc. d/b/a Beacon Hardware v.
Donovan,* 742 F.2d 12, 19 (1st Cir. 1984) (owners of similar equipment
had implemented the proposed abatement); *Mod. Drop Forge, Co. v.
Sec'y of Labor,* 683 F.2d 1105, 1114 (7th Cir. 1982) (feasibility shown
based on "the Company's previous use or contemplated use of a
protective mechanism"); *Coastal Drilling East, LLC,* No. 17-1179,
2019 WL 7080227, at *7-8 (OSHRC ALJ, Dec. 13, 2018) ("it is
reasonable to infer the cost of developing SOPs that include training and
observation would be minimal.").

show they are feasible. The record, however, reflects that these added positions not only remained vacant for long periods of time, but required employees in those positions to perform job tasks not related to security and provided limited coverage (8 hours as opposed to 24 hours a day).

Op. 17. Commissioner Laihow also easily rejected the Secretary's

faulty comparator evidence for other hospitals.

> Equally unpersuasive is the Secretary's argument that feasibility is established because other 'similarly situated psychiatric hospitals' make effective use of security guards. The evidence relating to these other facilities provides little to no meaningful points of comparison to Suncoast: the facilities are either of differing size or their size is unknown; some serve different functions (several, for example, are large hospital complexes); the guards' duties at these facilities are either different from the ones proposed in the citation or unknown; and most notably, it is not clear how the staffing positions at these facilities impacted the overall finances of the businesses that owned them.

*Id*. The remaining arguments by the Secretary were also summarily dismissed by Commissioner Laihow.

> The Secretary's other arguments fare[sic] no better. The Secretary claims that industry experts have recommended the third and fourth abatement measures and asserts that this proves their economic feasibility. But there is simply no proof in this case to support such a claim. As noted, Dr. Lipscomb was directly asked if she considered the economic costs of implementing her recommendations for these staffing measures, and she answered, 'No, I did not.'

The Secretary also claims that Respondents' own policies
emphasize the need for security, thus undermining their
assertion that the addition of the staff specified in the
abatement measures is not economically feasible. This too
misses the mark. Respondents' internal policy documents
are about security in general, not the additional security
staffing proposed in the two abatement measures. And as is
clear under Commission precedent, it is not Respondents'
burden to establish the proposed measures are
economically *infeasible—rather,* it is the Secretary's
burden to prove that they are *feasible. UHS of Denver,*
2022 WL 17730964, at *1; *Beverly Enters., Inc.,* 19 BNA
OSHC at 1191; *Waldon Health Care Ctr.,* 16 BNA OSHC
at 1064.

The Secretary's final argument is that 'publicly available
financial information' on UHS Inc.'s website shows it is a
'multi-billion-dollar company' that would remain
economically viable even with the hiring of additional staff
members. However, as Respondents note, this webpage is
not part of the record.[9]

Op. 17-18. In *Highlands*, on remand, Judge Patrick determined that the

Secretary failed to prove the proposed abatements requiring increasing

---

[9] Aside from the website not being a part of the record, the website to
which the Secretary referred is for UHS, Inc., which is the parent
corporation of Respondents, which are two separate legal entities and
sister subsidiaries. The Secretary failed to produce financial
information for each Respondent. Nor did the Secretary present
evidence that UHS, Inc., not cited by OSHA, should be somehow liable
under the OSH Act or argue to pierce the corporate veil.

staffing levels and providing dedicated security staff were economically feasible for similar reasons.[10] Slip op. at p. 21-25.

The Secretary likewise failed to prove that the third and fourth abatement measures would materially reduce the hazard. The ALJ relied on the conclusory testimony of the Secretary's two expert witnesses that all the proposed abatements would materially reduce the hazard. Slip op. at p. 55, 57. Dr. Lipscomb based her opinion on the anecdotal use of security by other facilities discussed in the OSHA

---

[10] ALJ Patrick also rejected the Secretary's argument that ALJ Augustine found similar abatement measures were economically feasible based on the OSHA's guidance document, Preventing Workplace Violence: A Roadmap for Healthcare Facilities ("Roadmap"), *available at* https://www.osha.gov/Publications/OSHA3827.pdf. *Id.* at pp. 24-25, *citing UHS Centennial Peaks LLC,* No. 19-1579, 2022 WL 4075583 (OSHRC ALJ, July 14, 2022).
 The OSHA Roadmap is a 2015 publication and "resource to assist healthcare employers and employees interested in establishing a workplace violence prevention program or strengthening an existing program." *Id.* at. p. 1. "[It] is advisory in nature and informational in content. "[It] is not a standard or regulation, and it neither creates new legal obligations nor alters existing obligations created by OSHA standards or the Occupational Safety and Health Act of 1970." *Id.* at. p. i.

Roadmap.[11] Slip op. at p. 138. But as Commissioner Laihow noted, the OSHA Roadmap does not lay a proper foundation to compare the anecdotal experiences of these hospitals to Suncoast. Op. 17. Therefore, the ALJ's finding that the third and fourth abatement measures would materially reduce the hazard was not supported by substantial evidence. The ALJ did not find that the practice of Suncoast and the industry, which is to have enough properly trained clinical staff, is inadequate to monitor, deescalate and if necessary, safely restrain patients. *Sturgill Roofing,* 2019 WL 1099857 (employer not required to implement proposed abatements if hazard may be materially reduced through other means). Further, replacing existing staff with security staff who perform the same functions would simply shift the hazard from one group of employees to another, not reduce the hazard.

---

[11] Dr. Forman did not provide a basis for his opinion. The ALJ also cited then-current and former employee testimony based on their limited experience at other facilities. *Id.* These witnesses provided no facts to establish that these facilities and Suncoast were comparable.

### C. The Use of the General Duty Clause and Reliance on OSHA Guidance Documents to Impose Regulatory-Type Requirements to Address Workplace Violence violates the Administrative Procedure Act.

Using the general duty clause and OSHA guidance documents to require Suncoast to employ security personnel for all patient care units and in the intake department on all shifts, essentially imposes regulatory-type requirements to address workplace violence in violation of the Administrative Procedure Act ("APA"). Under the APA, an agency must provide notice and an opportunity to comment on its proposed rules. 5 U.S.C. § 553(c).[12] Instead, OSHA has chosen not to promulgate a regulation, instead relying exclusively on the General Duty Clause to issue workplace violence citations to employers case-by-case. To address this complex multi-variable issue,

---

[12] OSHA has a long history of ignoring its responsibility to promulgate a regulation addressing workplace violence. In 2020, the U.S. House of Representatives passed H.R. 1309, 116th Cong. § 101 (2019), directing OSHA to promulgate a workplace violence standard. Last year, the House of Representatives introduced H.R. Bill 1195, which would require OSHA to develop and implement a workplace violence standard for the healthcare and social services industry. H.R. 1159, Workplace Violence Prevention for Health Care and Social Services Workers Act, 117th Congress (2021-2022).

OSHA relies heavily on its guidance documents such as the OSHA Guidelines and Roadmap. These guidance documents have become a de facto workplace violence regulation and a substitution for rulemaking in violation of the APA, as the regulated community was not provided with an opportunity for notice and comment on this guidance. Op. 16.

An OSHRC Commissioner expressed concern about OSHA's ability to abuse the General Duty Clause rather than engage in APA rulemaking. *See Integra Health Mgmt., Inc.*, 27 BNA OSHC 1838, 1852 (No. 13-1124, 2019) (Sullivan, concurring) (expressing concern that the breadth of section 5(a)(1)'s language leads to the agency issuing guidance, which becomes de facto mandatory).

As Commissioner Laihow and ALJ Patrick warn, OSHA's approach fails to properly vet proposed abatement methods or their economic effect on employers. As the D.C. Circuit has instructed:

> "But if adoption of the precaution would *clearly threaten the economic viability of the employer,* the Secretary should propose the precaution by way of promulgated regulations . . . rather than through adventurous enforcement of the general duty clause."

*Nat'l Realty & Constr. Co., Inc. v. OSHRC,* 489 F.2d 1257 n.37 (D.C. Cir. 1973) (emphasis added). OSHA has failed to even consider whether the proposed abatements imposed on Suncoast would threaten its economic viability or have an adverse economic effect on other employers in the industry. Rulemaking is the proper means to do so. *Id.*; *see also Michigan v. EPA et al.,* 135 S. Ct. 2699, 2707 (2015) (holding that agencies must consider cost when evaluating whether a rule is "appropriate and necessary" under the APA).

Ironically, now that OSHA has finally begun the rulemaking process for a workplace violence prevention rule for the healthcare and social assistance industries, OSHA admits that it must engage in rulemaking because enforcement under the general duty clause as well as its non-mandatory guidelines are ineffective. Earlier this year, OSHA convened a Small Business Advocacy Review Panel under Section 609(b) of the Regulatory Flexibility Act, as amended by the Small Business Regulatory Enforcement Fairness Act of 1996, 5 U.S.C. § 1 *et. seq.* ("SBREFA"). This panel convenes at the beginning stages of the rulemaking process and is where the agency elicits input on a

proposed rule from small employers in the industry. Following five panel conference calls and the submission of comments and data from small business in the effected industries, OSHA published a report May 1, 2023. In that report, OSHA states that "[it] decided to consider rulemaking after finding such enforcement under the General Duty Clause, as well as its current non-mandatory guidance, are inadequate to substantially reduce the risk of WPV facing employees in the healthcare and social assistance sector." Report of the Small Business Advocacy Review Panel on OSHA's Potential Standard for Prevention of Workplace Violence in Healthcare and Social Assistance, *available at* https://www.osha.gov/sites/default/files/OSHA-WPV-SBAR-Panel-Report.pdf, p. 5 (May 1, 2023).

On the economic feasibility of such a rule, the small businesses that participated in the panel discussions and submission of comments questioned the Secretary's estimated costs of the agency's wish list of abatements, such as hiring additional staff, and increased costs for additional training, engineering and administrative controls. They expressed concern that this increased cost would inhibit their ability to

deliver patient care and services at current levels. *Id.* pp. 42-43 and 54-55. As a result, the panel recommended to OSHA that it conduct additional research and review of the accuracy of its cost estimates, estimated use frequencies and price levels, and determine overall whether the rule is necessary and economically feasible. *Id.* p. 55. Thus, even small businesses in the rulemaking process, solicited for feedback years after the citation was issued in this case, have challenged the economic feasibility of the Secretary's proposed abatements. Without requiring the Secretary to prove that each proposed abatement is economically feasible and absent rulemaking, OSHA is improperly bypassing the APA.

### D. The General Duty Clause as Applied Deprived Suncoast of Fair Notice of the Third and Fourth Proposed Abatement Measures.

The third and fourth proposed abatement mandated that Suncoast:

> Designate specific staff with specialized training in security to monitor patients for potential aggression on all shifts and to assist in preventing and responding to violent events occurring in the units. Designated staff must have the physical capability to effectively respond to aggressive patients. The staff designated to monitor and respond to patient aggression should not be given

> other assignments such as patient rounds, which would prevent the designated person from immediately responding to an alarm or other notification of a violent incident… An additional designated staff member with specialized training in security should be available at intake on all shifts. This staff member should have the physical capability to respond to aggressive patients. This staff person should not be given other assignments such as patient rounds, which would prevent the person from immediately responding to an alarm or other notification of a violent incident.

Slip op. at 135-136. The Secretary (and ALJ) failed to explain the specialized security training required for this dedicated round-the-clock security staff, whether they would be armed or have any type of weapon, how such security are expected to monitor patients, prevent or respond to violent events or how they would differ from existing staff in terms of physical capability, qualifications, training or duties.

It is a "basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 107 (1972). The Due Process Clause of the Fifth Amendment requires that regulated parties be given fair notice of conduct that is prohibited or required. *FCC v. Fox TV Stations, Inc.*, 567 U.S. 239 (2012). Regulated parties "should know what is required of them so they may act accordingly; and precision and guidance are

34

necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *Id*. at 239.

OSHA is not exempt from this "fundamental principle in our legal system assured by the Fifth Amendment's Due Process Clause" "that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *BHC Nw. Psychiatric Hosp. LLC*, 951 F.3d 558, 566 (D.C. Cir. 2020) (citing *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253, 132 S.Ct. 2307, 183 L.Ed.2d 234 (2012)). As a result, the General Duty Clause applies "only when a reasonably prudent employer in the industry would have known that the proposed method of abatement was required." *Id*. (quoting *Donovan v. Royal Logging Co.*, 645 F.2d 822, 831 (9th Cir. 1981)).

Notice is provided when an abatement measure is in accord with "well-known industry best practices" and peer-reviewed research. *BHC*

*Nw.*, 951 F.3d at 566.[13] The Secretary is tasked with proving that a feasible abatement method exists that "conscientious experts, familiar with the industry" would recommend as methods to eliminate or materially reduce the recognized hazard. *Pepperidge Farm, Inc.*, 17 BNA OSHC 1993, 2032, 1995-97 CCH OSHD ¶ 31,301, p. 44,014 (No. 89-0265, 1997) (citing *Nat'l Realty & Constr. Co. v. OSHRC*, 489 F.2d 1257 (D.C. Cir. 1973)). To that end, "the Secretary must specify the particular steps a cited employer should have taken to avoid citation, and demonstrate the feasibility and likely utility of those measures." *Beverly Enters, Inc.*, 19 BNA OSHC 1161, 1191 (No. 91-3144, 2000); *Nat'l Realty and Constr. Co., Inc.*, 489 F.2d at 1267. *See also Mid-South Waffles, Inc*., No 13-1022, 2019 WL 990226, *6 (OSHRC Feb. 15, 2019) (vacating General Duty Clause citation where the Secretary failed to assert and prove an adequate work rule or practice for how often to clean the grease drawer at a fast-food restaurant other than "on

---

[13] In *BHC Nw.*, fair notice was not considered as an issue by the Court because the proposed abatements were included in the employer's written policies but not consistently followed. *Id.*

a regular and timely basis"); *see also A. H. Sturgill Roofing, Co.*, 27 BNA OSHC 1809 (noting that the Secretary failed to identify a time limit for working on a roof to mitigate heat exposure).

The Secretary (and ALJ) did not describe the specialized security training required for this dedicated round-the-clock security staff, whether they would be armed or how their training, duties or job qualifications would differ from existing staff.[14] As discussed, using security type staff in a behavioral health facility is not industry practice nor has been proven to be effective by peer reviewed research.[15] TJC suggests considering the use of security personnel only in emergency departments which Suncoast does not have. Tr., Ex. 86. Therefore, the

---

[14] All staff at Suncoast with patient interaction received extensive training and retraining on monitoring patients for aggressive behaviors, responding to behavioral health emergencies, using verbal de-escalation to address aggressive behavior, and physically restraining a patient when necessary. During such training, staff must demonstrate the physical ability to perform the restraint holds and techniques. Staff also conduct observations of each patient every 15 minutes for early detection of escalating behaviors.

[15] In the Roadmap, OSHA's listing of suggested administrative controls for healthcare employers do not list using security guards. *Id.* at 16-17.

Secretary failed to provide Suncoast with sufficient advanced notice that it was required to hire a dedicated security force to be present on all shifts and in the intake department at all times.

OSHA's use of guidance documents to support notice of abatement measures violates its own long-standing policy on the use of such documents this way. In a 1996 letter of interpretation in response to concerns over similar guidance on preventing workplace violence, OSHA stated its guidelines presented:

> a 'best practices' guide, to disseminate information, which interested employers are free, not forced, to use. The Guidelines do not create any new duties under the OSH Act. Therefore, an employer's failure to implement them does not constitute a violation of Section 5(a)(1).[16]

Additionally, in 2004, the Directorate of Enforcement Programs issued a memo to all Regional Administrators on the use of guidance documents:

> This memorandum is a reminder that these guidelines [on ergonomic hazards] are not new standards or regulations and do not create any new OSHA duties for employers. An

---

[16] OSHA Letter of Interpretation to Congressman Cass Ballenger (Oct. 23, 1996), addressing OSHA's "Guidelines for Workplace Violence Prevention Programs for Night Retail Establishments."

> **employer's failure to implement a guideline is, therefore, not a violation, or evidence of a violation of the general duty clause**...Furthermore, the fact that OSHA has developed industry-specific guidelines is not evidence of an employer's obligations under the general duty clause.

OSHA Memorandum for Regional Administrators from Fairfax, Director of the Directorate of Enforcement Programs, Reminder: Guidelines Not Basis for Citation (June 7, 2004) (emphasis added).

Moreover, recognizing widespread agency abuse of guidance documents, in 2019 President Trump issued Executive Order 13891, which "require[s] that agencies treat guidance documents as non-binding both in law and in practice." E.O. 13891, Promoting the Rule of Law Through Improved Agency Guidance Documents (Oct. 9, 2019). This Executive Order recognizes that agencies may only clarify existing obligations through non-binding guidance documents, because they are not subject to notice and comment rulemaking procedures of the APA. *Id.* Further, the Executive Order recognizes that "even when accompanied by a disclaimer that it is non-binding, a guidance document issued by an agency may carry the implicit threat of

enforcement action if the regulated public does not comply." *Id.*
Because of these specific concerns, the Executive Order requires
agencies to "establish or maintain on its website a single, searchable,
indexed database that contains or links to all guidance documents in
effect from such agency or component. The website shall note that
guidance documents lack the force and effect of law, except as
authorized by law or as incorporated into a contract." *Id.* Yet OSHA
continues to flout its own policy on the use of guidance documents and
now this Executive Order by prosecuting employers for allegedly not
following the Guidelines and Roadmap. *See, e.g.*, *UHS of Fuller, Inc.
and UHS of Delaware, Inc.,* OSHRC Docket No. 20-0032 (ALJ Jan.
31, 2023 (pending OSHRC review).[17]

    In *BHC Nw.*, the Court also recognized that inconsistent
application of the General Duty Clause could also deprive an employer
of constitutionally required fair notice. 951 F.3d at 566-67. OSHA's
approach, adopted by the Commission in this and similar cases is a case

---

[17] Available at https://www.oshrc.gov/assets/1/6/20-
0032_Decision_and_Order_DATED_(for_web).pdf.

study in depriving an employer of fair notice because of inconsistent application of the proposed abatements. When proposing abatements for the use of security type personnel, the Secretary has taken inconsistent positions in various cases involving facilities affiliated with Suncoast's parent company, UHS, Inc., which deprived Suncoast of fair notice. *See UHS of Denver, Inc. (Highlands),* OSHRC Docket No. 19-0550 (ALJ June 1, 2023) (designate specific staff with specialized training in security and/or hire trained security officers to monitor patients and assist in preventing and responding to incidents)[18]; *Pembroke* and *HRI Hosp., Inc. dba  Arbour-HRI Hosp.*, OSHRC Docket No. 1703 (ALJ, Jan. 22, 2019)(provide security staff and/or "crisis intervention specialists" who are existing clinical staff to monitor patients, prevent and respond to incidents)[19]; *Centennial Peaks* (designate a response team of staff members or hire a single security

---

[18] Available at **AMENDED_Final_ALJ_Decision_and_Order_19-0550_UHS_of_Denver_Inc._dba_Highlands_Behavioral_Health_System_-_for_website.pdf (oshrc.gov)**.
[19] Available at *https://www.oshrc.gov/assets/1/18/17-0303__HRI_FINAL_DECISION_1.8.191.html?8314*.

guard to respond to codes but not monitor patients or prevent incidents)[20]; *UHS of Fuller, Inc. and UHS of Delaware, Inc.,* OSHRC Docket No. 20-0032 (ALJ Jan. 31, 2023 (pending OSHRC review)(provide trained security staff on each shift to assist in preventing and responding to incidents but not monitor patients); *UHS of Delaware, Inc. dba Cedar Springs Hosp.,* OSHRC Docket No. 20-0887 (pending ALJ decision) (designate staff with specialized security training and/or hire trained security specialists to monitor patients and assist in preventing and responding to codes); *BHC Nw. Brooke Glen Behavioral Hosp.,* OSHRC Docket No. 17-0063 (ALJ, Jan. 22, 2019) (security or security trained personnel not a proposed abatement measure)[21]; *HRI Hosp., Inc. dba Arbour-HRI Hosp.*, OSHRC Docket No. 1703 (ALJ, Jan. 22, 2019) (employ security staff when necessary to assist in responding to violent events but that do not monitor patients

---

[20] Available at *https://www.oshrc.gov/assets/1/18/UHS_CP_Docket_No._19-1579_Augustine__REDACTED.pdf?12092*.

[21] Available at *https://www.oshrc.gov/assets/1/18/17-0063.BHC.*FINAL*.pdf?8309*.

or prevent incidents).[22] This has placed Suncoast and other employers in a no-win position to blindly navigate the hodgepodge of conflicting and ambiguous requirements on actions required to mitigate workplace violence.

### E. The Commission Erred by Not Concluding that Suncoast Could Rely on Guidance by the FDMH and Other Regulatory Bodies.

The OSHRC did not address Suncoast's contention that it can rely on guidance by the FDMH and other regulatory and accrediting bodies which do not require the use of security type personnel. The FDMH, CMS and other regulatory and accrediting bodies like TJC have special expertise in striking the balance between maintaining a safe environment for patients and staff and minimizing the impact on

---

[22]    Available at *https://www.oshrc.gov/assets/1/18/17-0303__HRI_FINAL_DECISION_1.8.191.html?8314*. In *HRI Hospital*, ALJ Rooney noted that the Secretary did not clarify when this was required or what is meant by "security staff" and the Citation did not specify whether HRI needed more employees or if it could assign existing workers into a security role. Slip op. at pp. 40-41. ALJ Rooney found that the Secretary failed to prove that HRI's existing staffing and training was inadequate to respond to "violent events." *Id.* at p. 41.

effective clinical care. For example, these agencies and bodies factor in and account for staff as well as patient safety in their regulations. These regulatory bodies regulate the restraint of patients and the clinical and other training requirements of any personnel who monitor or restrain patients.[23] No one disputes that patient safety and staff safety are

---

[23] CMS regulates the restraint of patients by staff in a behavioral health facility. CMS Reg. §482.13(e). TJC, through which CMS enforces its conditions of participation, requires any personnel who engage in the physical restraint of patients to have extensive clinical training in: 1) identifying patient behaviors that could result in a restraint; 2) use of non-physical intervention such as verbal de-escalation; 3) choosing the least restrictive intervention based on an assessment of the patient's medical or behavioral status and condition; 4) safe application of all types of restraint; 5) clinical identification of behavioral changes that indicate a restraint is no longer necessary; and 6) monitoring the physical and psychological well-being of the patient. The Joint Commission PC.03.05.17.

The FDMH also regulates multiple issues relating to the third and fourth proposed abatements: 1) a sufficient number and types of qualified staff shall be on duty and available at all times to provide necessary and adequate safety and care (Fl. Stat. 65E-12.105 (3); the handling of security incidents which includes "a danger to the physical safety of personnel" (Fl. Stat. 65E-12.106 (9)(c)(9)) seclusions or restraints of patients (65E-12.106 (9)(b)(9) and (19)(c)); and any serious bodily trauma received by a staff member (65E-12.106 (14) (f)(c)(9)).

intertwined. In the context of behavioral health, they cannot be examined separately in a vacuum to effectively mitigate the hazard. As a result, the Secretary should defer to these agencies in matters which affect clinical care of patients and the therapeutic treatment environment, such as whether requiring security personnel to monitor, de-escalate and physically restrain patients is contra-therapeutic or effective. The Secretary lacks expertise in patient care and has not engaged in rulemaking or even engaged with patent care regulatory agencies at the federal or state level to consider these competing regulatory interests.

This concern was raised by industry respondents to the Small Business Advocacy Review Panel which stated that an OSHA workplace violence rule "could create conflicts with existing regulatory requirements," and specifically that many healthcare entities are regulated by CMS conditions of participation via TJC and that TJC already had a workplace violence standard with similar or even conflicting requirements to OSHA's proposals. Report of the Small Business Advocacy Review Panel on OSHA's Potential Standard for

Prevention of Workplace Violence in Healthcare and Social Assistance, *available at* [https://www.osha.gov/sites/default/files/OSHA-WPV-SBAR-Panel-Report.pdf](https://www.osha.gov/sites/default/files/OSHA-WPV-SBAR-Panel-Report.pdf), pp. 47-48 (May 1, 2023). As a result, the panel recommended that OSHA "review existing regulations, guidance, and accreditation standards on WPV prevention in determining the need for a rule (e.g., CMS guidance and conditions of participation for Medicare and Medicaid and Joint Commission accreditation standards), avoid duplication unless necessary to mitigate risks associates with workplace violence, and ensure any OSHA requirements do not conflict with other governing bodies or standards-setting organizations." *Id.* p. 48.

Monitoring, de-escalating and physically restraining patients must be done by trained *clinical* staff. *See* n.18. The Secretary's approach is based on outdated and stereotyped views of patients needing mental health treatment—that such individuals represent a constant danger that must be guarded and manhandled by security personnel trained to deal with criminal activity committed by members of the general population not afflicted with mental health issues. OSHA

should be required take its own advice and defer to the federal and state agencies with the appropriate expertise in this area.

## XII.  CONCLUSION

The Commission has run roughshod over its own precedents, and in so doing, has created a moving target for Petitioner Suncoast on each of the issues raised in this petition. This abuse of discretion requires the Court set aside the order of the Commission and vacate the citation.

Respectfully submitted,

*/s/ Dion Y. Kohler*
Dion Y. Kohler
Melanie L. Paul
JACKSON LEWIS P.C.
171 17th Street, N.W.,
Suite 1200
Atlanta, GA 30363
Direct: (404) 586-1843
Fax: (404) 525-1173
*Attorneys for Petitioner*
*Premier Behavioral*
*Health Solutions of*
*Florida, Inc. dba Suncoast*
*Behavioral Health Center*

## CERTIFICATE OF COMPLIANCE WITH LENGTH AND FORMATTING

I certify that this brief includes 8808 words, including footnotes and excluding the items set forth in FRAP 32(f), as measured by Microsoft Office Professional Plus 2019, and that it is prepared in 14-point Times New Roman font.

*/ s /  Dion Y. Kohler*

## CERTIFICATE SERVICE

I certify that this brief was served on all parties through the Court's electronic filing system and by U.S. Mail.

*/s/ Dion Y. Kohler*